FILED JUL 8 '02 PM 2:08 USDCALS

# IN THE UNITED STATES DISTRICT COURT FOR THE
## SOUTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

GONZALO FITCH MONTIEL, et al.,　　)
　　　　　　　　　　　　　　　　　　　)
　　　　Plaintiffs,　　　　　　　　　)
　　　　　　　　　　　　　　　　　　　)
v.　　　　　　　　　　　　　　　　　　)　　CIVIL ACTION NO.
　　　　　　　　　　　　　　　　　　　)　　01-0447-BH-S
DON DAVIS, et al.,　　　　　　　　　)
　　　　　　　　　　　　　　　　　　　)
　　　　Defendants.　　　　　　　　　)

**PUBLISH**

## MEMORANDUM OPINION AND ORDER

The action is now before this three-judge court on the parties' respective motions for summary judgment.[1]　Upon consideration of these motions, the respective briefs filed in support thereof (Docs. 84, 93, 95 and 99) and opposition thereto (Docs. 100, 102, 103, 108, and 111), and all other pertinent portions of the record, we conclude that the defendants' motions are due to be granted while the plaintiffs' motion must be denied.

---

[1]Defendant-intervenors Ken Guin and Andrew Hayden filed their motion for summary judgment on February 27, 2002 (Doc. 83). On March 5, 2002, a motion for summary judgment was filed by defendant-intervenor Don Siegelman (Doc. 92) while plaintiffs filed a motion for partial summary judgment (Doc. 94). The State Election Officials filed their motion on March 6, 2002 (Doc. 98).

## I.  BACKGROUND AND PROCEDURAL HISTORY

The history of the Alabama Legislature's difficulty with reapportionment is

well documented.  *See,* Kelly v. Bennett, 96 F.Supp.2d 1301, 1308-1312 (M.D. Ala.

2000).  The districts for the Alabama Senate and House of Representatives, which

have been used since the 1990 federal census, were created by a consent judgment

entered in the Circuit Court of Montgomery County, Alabama, which was not

appealed.  This districting scheme, known as the Reed-Buskey Legislative

Districting Plan ("Reed-Buskey Plan"), was later challenged in both state and

federal court litigation on equal protection (racial gerrymandering) grounds but was

subsequently upheld.  *See,* Sinkfield v. Kelly, 531 U.S. 28, 121 S.Ct. 446, 148

L.Ed.2d 349 (2000)(held that white voters lacked standing to claim that Alabama's

Legislative re-districting plan was racial gerrymandered in violated Equal Protection

Clause);  Rice v. Sinkfield, 732 So.2d 993 (Ala. 1998)(appeal dismissed as moot).

In contrast to this history, the Alabama Legislature has now successfully

completed its responsibility to reapportion the State's House and Senate districts

pursuant to the 2000 census. We herein reject plaintiffs challenges to that effort.

In this action, as now constituted,[2] plaintiffs first claim that Acts 2001-727

---

[2]Plaintiffs' original complaint was filed on June 21, 2001, and was predicated upon the
Alabama Legislature's failure to reapportion the United States Congressional districts, the
Alabama Legislative (House and Senate) districts, and the Alabama State Board of Education

and 2001-729 violate the constitutional requirements of one-person, one-vote under

the mandates of Reynolds v. Sims, 377 U.S. 533, 84 S.Ct. 1362, 12 L.Ed.2d 1206

(1964) and Roman v. Sincock, 377 U.S. 695, 84 S.Ct. 1449, 12 L.Ed.2d 620

(1964). Plaintiffs contend that the Alabama Legislature did not make an honest and

good faith effort to populate State Senate and House districts equally, as required by

the Fourteenth Amendment. Plaintiffs also challenge these districting plans on the

grounds that the Alabama Legislature has implemented a goal of racial maximization

in violation of the Equal Protection Clause of the Fourteenth Amendment. Plaintiffs

further contend that the election scheme created in Acts 2001-727 and 2001-729

---

districts to reflect the population changes that have occurred according to the 2000 census. Plaintiffs amended their complaint on August 3, 2001 (Doc. 18) to reflect that the Alabama Legislature had enacted legislation, namely Acts 2001-727 and 2001-729, redistricting the Alabama Senate and House, and to challenge same. On November 8, 2001, Count III of plaintiffs' First Amended Complaint, the claim concerning the Alabama State Board of Education districts, was severed (Doc. (54) and transferred to the originally assigned District Judge for disposition as a single judge matter. See, Montiel v. Davis, Civil Action No. 01-0780-BH-S. On November 20, 2001, Count II of plaintiffs' First Amended Complaint, the claim concerning the United States Congressional districts, was severed (Doc. 58) and transferred to the United States District Court for the Middle District of Alabama for consolidation with a subsequently filed action. See, Douglas v. Alabama, 01- CV-992 (M.D. Ala.). On December 17, 2001, this Court rejected plaintiffs' proposed Second Amended Complaint essentially on grounds that plaintiffs failed to comply with the leave to amend which was granted by the Court at the hearing conducted on November 8, 2001. See, Orders of November 8, 2001 (Doc. 53) and December 17, 2001 (Doc. 61). Plaintiffs thereafter filed their Third Amended Complaint on December 21, 2001 (Doc. 63), which added additional plaintiffs and claims but removed all reference to the Congressional and Board of Education election plans. The only remaining claims in this litigation, therefore, are those challenging Alabama's new Senate and House districts as reapportioned under Acts 2001-727 and 2001-729.

violates Section 2 of the Voting Rights Act by overpopulating white majority districts and thereby diluting their vote.

## II.   OPERATIVE FACTS

The Alabama Legislature enacted the subject Senate and House redistricting plans on July 3, 2001.   The Senate plan, Act 2001-727, received preclearance under § 5 of the Voting Rights Act, 42 U.S.C. § 1973c, on October 15, 2001, and the House plan, Act 2001-729, was precleared November 5, 2001.   Alabama Acts 2001-727 and 2001-729 incorporate the results of the 2000 census.

Under the previous Reed-Buskey Plan, there were eight black-majority Senate districts and 27 black-majority House Districts. There are still eight black-majority Senate districts under Act 2001-727 and 27 black-majority House Districts under Act 2001-729.   Under Act 2001-727, 6 of the 8 black-majority Senate districts and 11 of the 27 white-majority Senate districts have a population that is below the population of an ideal Senate district.   However, the overall population deviation[3] of Act 2001-727 is 9.78%.   Under Act 2001-729, 23 of the 27 black-majority House districts and 31 of the 78 white-majority House districts have a population that is below the population of an ideal House district.   The overall

_____

[3]*See*, Abrams v. Johnson, 521 U.S. 74, 98,  117 S.Ct. 1925, 1939, 138 L.Ed.2d 285 (1997)("Overall population deviation is the difference in population between the two districts with the greatest disparity.").

population deviation of Act 2001-729 is 9.93%.  All Senate districts under Act

2001-727 and all House districts under Act 2001-729 are within 5% of the

population of an ideal district of those respective districting plans.

The Alabama Legislature established Guidelines for Reapportionment and

Redistricting through the work of its Permanent Legislative Committee on

Reapportionment ("PLCR") which provide, in pertinent part:

> In accordance with the Equal Protection Clause of the
> Fourteenth Amendment to the United States Constitution,
> legislative and State Board of Education districts will be drawn
> to achieve "substantial equality of population among the various
> districts."
>
> a.      As a general proposition, deviations from the "ideal
> district" population should be justifiable either as a result
> of limitations of census geography, or as a result of the
> promotion of a rational state policy.
>
> b.      In keeping with subpart a, above, proponents of
> legislative and State Board of Education reapportionment
> plans should establish as a high priority minimizing
> population deviations among the districts.  In any case, the
> relative population deviation for any legislative or state
> board of education district should not exceed plus or
> minus five percent (5%).  Adherence to this rule will
> insure that the overall deviation in the plan does not
> exceed ten percent (10%), which is generally considered
> by controlling federal judicial decisions as a permissible
> overall deviation.
>
> c.      Any proponent submitting a proposal to the
> Reapportionment Committee or the Legislature shall

> submit a detailed explanation of how the deviations in the
> proposed plan further the rational state policies described
> in Section IV of these Guidelines, or are necessitated by
> census geography.

Third Amended Complaint at ¶ 60. The Guidelines, at Section IV, also favor the

use of traditional race-neutral districting criteria such as compactness, contiguity,

respect for communities of interest, preservation of the cores of existing districts and

avoidance of conflicts between incumbents.[4]

Plaintiffs have proffered no evidence to refute the abundant evidence

submitted by the defendants and defendant-intervenors which establishes that black

voters and Democratic voters in Alabama are highly correlated; that the Legislature

utilized recent election returns to ascertain actual voter behavior; and that Acts

2001-727 and 2001-729 were the product of the Democratic Legislators' partisan

political objective to design Senate and House plans that would preserve their

respective Democratic majorities.[5]  For example, although plaintiffs challenge the

evidence on admissibility grounds, plaintiffs do not refute the sworn testimony of

Mr. Sam Pierce, the expert designated by plaintiff Montiel in both the Congressional

action which was transferred to the Middle District of Alabama and in the instant

---

[4]*See*, Exhibit H (filed in support of plaintiffs' motion for summary judgment)  at p. 5-9.

[5]*See e.g.*, Blacksher Affidavit and Exhibits A-D attached thereto; Exhibits 1-12 to the
motion for summary judgment filed by Guin and Hayden (Docs. 83 and 84).

case, that black census populations are so strongly correlated with Democratic

voting behavior throughout Alabama that, when he drew the Congressional plan

adopted by this Court in <u>Wesch v. Hunt</u>, 785 F.Supp. 1491, 1500 (S.D. Ala.

1992)(three-judge court), and the plan proposed by Mr. Montiel in the current

Congressional redistricting litigation, he referred only to census data and attempted

to minimize the number of black persons residing in districts he was designing to

favor Republican candidates. *See also*, Report of Richard L. Engstrom (Blacksher

Affidavit at Exh. D at 6-7) (employed the same type of examination relied upon in

<u>Hunt v. Cromartie</u>, 526 U.S. 541, 119 S.Ct. 1545, 143 L.Ed.2d 731 (1999), and

concluded that "as the African American percentage [of votes] increases across

counties, the percentages of the vote for the Democratic candidates, regardless of

their race, increases as well [and] [t]his relationship is especially pronounced for the

counties in which African Americans constitute a majority of the registered

voters.").

Plaintiffs, despite their contentions to the contrary, have failed to proffer

evidence, either direct or circumstantial, which establishes to any degree that the

Alabama Legislature subordinated traditional race-neutral districting principles such

as those set forth in Section IV of the Guidelines to racial considerations in violation

of the Fourteenth Amendment.   Plaintiffs essentially challenge Acts 2001-727 and

2001-729 solely on their face, relying on the population numbers and district boundaries alone. Plaintiffs predicate their contention that the apportionment process utilized by the Alabama Legislature had a taint of arbitrariness or discrimination on unsubstantiated supposition.

## III. ANALYSIS

### A.   ONE-MAN, ONE-VOTE CHALLENGE

The principles of the one-man one-vote constitutional requirement were first enunciated in Reynolds v. Sims, 377 U.S. at 577, 84 S.Ct. at 1389-90:

> By holding that as a federal constitutional requisite both houses of a state legislature must be apportioned on a population basis, we mean that the Equal Protection Clause requires that a State make an honest and good faith effort to construct districts, in both houses of its legislature, as nearly of equal population as is practicable. We realize that it is a practical impossibility to arrange legislative districts so that each one has an identical number of residents, or citizens, or voters. Mathematical exactness or precision is hardly a workable constitutional requirement.

The Supreme Court made it abundantly clear that "[s]o long as the divergences from a strict population standard are based on legitimate considerations incident to the effectuation of a rational state policy, some deviations from the equal-population principle are constitutionally permissible with respect to the apportionment of seats in either or both of the two houses of a bicameral state legislature." 377 U.S. at

579, 84 S.Ct. at 1391.   In <u>Roman v. Sincock</u>, the Supreme Court rejected the

district court's "attempt to state in mathematical language the constitutionally

permissible bounds of discretion in deviating from apportionment according to

population" and instead declared:

> In our view the problem does not lend itself to any such uniform
> formula, and it is neither practicable nor desirable to establish
> rigid mathematical standards for evaluating the constitutional
> validity of a state legislative apportionment scheme under the
> Equal Protection Clause. Rather, the proper judicial approach is
> to ascertain whether, under the particular circumstances existing
> in the individual State whose legislative apportionment is at
> issue, there has been a faithful adherence to a plan of
> population-based representation, with such minor deviations
> only as may occur in recognizing certain factors that are free
> from any taint of arbitrariness or discrimination.

377 U.S. at 710, 84 S.Ct. at 1458.

At the outset of this litigation, plaintiffs' claims were predicated on the

Legislature's failure to reapportion the Alabama legislative districting plan pursuant

to the 2000 census figures.  When the Legislature performed that function, plaintiffs

challenged the effort on such grounds as the existence of population deviations

which were "not based on legitimate considerations incident to the effectuation of a

rational state policy, nor for any purpose or policy recognized by the Supreme Court

to allow states minor deviations among districts."  Third Amended Complaint at ¶

77, *citing* <u>Marylanders for Fair Representation v. Schaefer</u>, 849 F.Supp. 1022 (D.

Md. 1994). Although plaintiffs' counsel appeared to rely solely on the <u>Marylanders</u> standard[6] when he argued for leave to file an amended complaint, plaintiffs have in one respect retreated from that position as evidenced by certain of the plaintiffs' identical responses to defendant Bennett's interrogatory requests:

> The applicable "standard" that I contend is applicable to my malapportionment claims, and which was violated by the State of Alabama in Act 2001-727 and 2001-729, is based on the Supreme Court case law beginning with <u>Reynolds v. Sims</u> and <u>Roman v. Sincock</u>. The applicable "standard" was articulated in <u>Daly v. Hunt</u>, 93 F.3d 1212 (4th Cir. 1996) . . . and is stated as follows:
>
>> On the other hand, if the maximum deviation is less than 10%, the population disparity is considered de minimis and the plaintiff cannot rely on it alone to prove invidious discrimination and arbitrariness. To survive summary judgment, the plaintiff would have to produce further evidence to show that the apportionment process had a "taint of arbitrariness or discrimination." <u>Daly v. Hunt</u>, 93 F.3d 1212, 1220, *citing* <u>Roman v. Sincock</u>, 377 U.S. at 710.
>
> The applicable "standard" was articulated in <u>Roman v. Sincock</u> as follows:
>
>> Rather, the proper judicial approach is to ascertain whether, under the particular circumstances existing in the individual State whose legislative apportionment is at

---

[6]The standard set forth in <u>Marylanders</u> regarding deviations of less than 10% directs that "[t]o prevail, . . . the Plaintiffs have the burden of showing that the 'minor' deviation in the plan results *solely* from the promotion of an unconstitutional or irrational state policy." 849 F. Supp. at 1032 (emphasis added).

> issue, there has been a faithful adherence to a plan of
> population-based representation, with such minor
> deviations only as may occur in recognizing certain
> factors that are free from any taint of arbitrariness or
> discrimination.

Roman v. Sincock, 377 U.S. at 710.

Response of Plaintiff Bobby G. Humphryes to Defendant Bennett's First Set of

Interrogatories at pp. 3-4 (submitted in support of the motion for summary judgment

filed by Guin and Hayden and as Plaintiffs' Supplemental Exhibit GG). *See also*,

Response of Plaintiff Gonzalo Fitch Montiel at pp. 3-4 (Plaintiffs' Supplemental

Exhibit CC); Response of Plaintiff Sheldon Day at 4-5 (Plaintiffs' Supplemental

Exhibit DD); Response of John Rice at p. 4 (Plaintiffs' Supplemental Exhibit

HH).[7]

Plaintiffs' retreat from their reliance on Marylanders, if any, is of no

consequence.  Plaintiffs have simply failed by any standard to challenge the

deviations existing in Acts 2001-727 and 2001-729.  As demonstrated above,

plaintiffs themselves acknowledge that they can survive summary judgment only if

they produce "evidence to show that the apportionment process had a 'taint of

---

[7]In contrast to the Responses of Montiel, Humphryes and John Rice, plaintiffs John Lang and Camilla Rice answer with "I do not make any claims as described in Interrogatory #6" when asked if they contend that the *Marylanders* standard is applicable to their malapportionment claim.  Plaintiffs' Supplemental Exhibits EE and FF at p. 5.

arbitrariness or discrimination'." <u>Daly v. Hunt,</u> 93 F.3d 1212, 1220, *quoting* <u>Roman v. Sincock,</u> 377 U.S. at 710, 84 S.Ct. at 1458.  This they have failed to do.

It is well settled that "[a legislative] apportionment plan with a maximum population deviation under 10% falls within this category of minor deviations." <u>Brown v. Thompson,</u> 462 U.S. 835, 842-43, 103 S.Ct. 2690, 2696, 77 L.Ed.2d 214 (1983).  The Fourth Circuit in <u>Daly</u> summarized the importance of the distinction between plans containing less than 10% deviation and those with greater deviation:

> [I]n <u>White v. Regester,</u> [412 U.S. 755, 763, 93 S.Ct. 2332, 2338, 37 L.Ed.2d 314 (1973)], the Court expressly stated
>
>> [W]e did not hold in <u>Swann v. Adams,</u> 385 U.S. 440 [87 S.Ct. 569, 17 L.Ed.2d 501] (1967), or <u>Kilgarlin v. Hill,</u> 386 U.S. 120 [87 S.Ct. 820, 17 L.Ed.2d 771] (1967), or later in <u>Mahan v. Howell,</u> [410 U.S. 315, 93 S.Ct. 979, 35 L.Ed.2d 320 (1973)], that *any* deviations from absolute equality, however small, must be justified to the satisfaction of the judiciary to avoid invalidation under the Equal Protection Clause. For the reasons set out in <u>Gaffney v. Cummings,</u> [412 U.S. 735, 93 S.Ct. 2321, 37 L.Ed.2d 298 (1973)],  we do not consider relatively minor population deviations among state legislative districts to substantially dilute the weight of individual votes in the larger districts so as to deprive individuals in these districts of fair and effective representation.
>
> 412 U.S. 755, 763-64, 93 S.Ct. 2332, 2338, 37 L.Ed.2d 314 (1973).

The 10% *de minimis* threshold recognized in <u>Brown</u> does not completely insulate a state's districting plan from attack of any type. Instead, that level serves as the determining point for allocating the burden of proof in a one person, one vote case. A maximum deviation

of greater than 10% automatically establishes a *prima facie* violation of the one person, one vote principle. If the plaintiff establishes this level of disparity in population among the districts, the burden of proof shifts to the state to justify the deviations by showing a rational and legitimate state policy for the districts.

On the other hand, if the maximum deviation is less than 10%, the population disparity is considered *de minimis* and the plaintiff cannot rely on it alone to prove invidious discrimination or arbitrariness. To survive summary judgment, the plaintiff would have to produce further evidence to show that the apportionment process had a "taint of arbitrariness or discrimination." <u>Roman v. Sincock</u>, 377 U.S. at 710, 84 S.Ct. at 1458. **In other words, for deviations below 10%, the state is entitled to a presumption that the apportionment plan was the result of an "honest and good faith effort to construct districts ... as nearly of equal population as is practicable."** <u>Reynolds v. Sims</u>, 377 U.S. at 577, 84 S.Ct. at 1390. However, this is a rebuttable presumption.

<u>Daly</u>, 93 F.3d at 1220 (emphasis added). It is undisputed that Alabama is here entitled to this critical presumption. In order to rebut this presumption, plaintiffs had "the burden of showing that the 'minor' deviation in the plan results *solely* from the promotion of an unconstitutional or irrational state policy." <u>Marylanders</u>, 849 F. Supp. at 1032 (emphasis added). The plaintiffs were further required to "demonstrate . . . that the asserted unconstitutional or irrational state policy is the actual *reason* for the deviation." *Id.* (emphasis in original), *citing*, <u>Karcher</u>, 462 U.S.725, 740-44, 103 S.Ct. 2653, 2663-67, 77 L.Ed.2d 133 (1983). "In addition, the plaintiff[s] must prove that the minor population deviation is *not* caused by

promotion of legitimate state policies." Marylanders, 849 F. Supp. at 1032

(emphasis in original). The "use of a plus or minus five percent population

window" is not an illegitimate state purpose or objective. *Id.* at 1034, *citing,*

Voinovich, 507 U.S. at ----, 113 S.Ct. 1149, 1159, 122 L.Ed.2d 500 (1993)

("requirement is not an inflexible one."); Reynolds v. Sims, 377 U.S. at 577-81, 84

S.Ct. at 1389- 92 ("more flexibility may therefore be constitutionally permissible

with respect to state legislative apportionment than in congressional districting.").

Plaintiffs have simply failed to carry their burden.


**B.    RACIAL GERRYMANDERING CHALLENGE**

Plaintiffs have also failed to substantiate their racial gerrymandering claim,

alternately described, *inter alia*, as "the systematic overpopulation of white-majority

districts and underpopulation of black-majority districts." Plaintiffs' Consolidated

Brief in Opposition (Doc. 103) at 5. Plaintiffs again set forth legal precedent that

establishes their burden of proof but then promptly ignore that burden and rely on

the contention that the defendants have somehow failed to prove that the State did

not impermissibly consider race. *Id.* at 19-24. Plaintiffs quote the following excerpt

from Hunt v. Cromartie as grounds for imposing this burden of proof on the

defendants:

14

Our decisions have established that all laws that classify citizens on the basis of race, including racially gerrymandered districting schemes, are constitutionally suspect and must be strictly scrutinized. Shaw II, 517 U.S., at 904, 116 S.Ct. 1894; Miller v. Johnson, 515 U.S. 900, 904-905, 115 S.Ct. 2475, 132 L.Ed.2d 762 (1995); Adarand Constructors, Inc. v. Peñña, 515 U.S. 200, 227, 115 S.Ct. 2097, 132 L.Ed.2d 158 (1995). When racial classifications are explicit, no inquiry into legislative purpose is necessary. See Shaw I, 509 U.S., at 642, 113 S.Ct. 2816. *A facially neutral law, on the other hand, warrants strict scrutiny only if it can be proved that the law was "motivated by a racial purpose or object,"* Miller, supra, at 913, 115 S.Ct. 2475, *or if it is " 'unexplainable on grounds other than race,'* " Shaw I, supra, at 644, 113 S.Ct. 2816 (quoting Arlington Heights v. Metropolitan Housing Development Corp., 429 U.S. 252, 266, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977)); see also Miller, supra, at 905, 913, 115 S.Ct. 2475. The task of assessing a jurisdiction's motivation, however, is not a simple matter; on the contrary, it is an inherently complex endeavor, one requiring the trial court to perform a "sensitive inquiry into such circumstantial and direct evidence of intent as may be available." Arlington Heights, supra, at 266, 97 S.Ct. 555; see also Miller, supra, at 905, 914, 115 S.Ct. 2475 (citing Arlington Heights ); Shaw I, supra, at 644, 113 S.Ct. 2816 (same). [Footnote omitted]

Districting legislation ordinarily, if not always, classifies tracts of land, precincts, or census blocks, and is race neutral on its face. North Carolina's 1997 plan was not atypical; appellees, therefore, were required to prove that District 12 was drawn with an impermissible racial motive--in this context, strict scrutiny applies if race was the "predominant factor" motivating the legislature's districting decision. To carry their burden, appellees were *obliged to show--using direct or circumstantial evidence, or a combination of both*, see Shaw II, supra, at 905, 116 S.Ct. 1894; Miller, 515 U.S., at 916, 115 S.Ct. 2475--*that "the legislature subordinated traditional race-neutral districting principles, including but not limited to compactness, contiguity, and respect for political subdivisions or communities defined by actual shared interests, to racial considerations,"* ibid.

Plaintiffs' Consolidated Brief in Opposition at 22-23, *quoting*, Hunt v. Cromartie,

526 U.S. 541, 546-47, 119 S.Ct. 1545, 1549, 143 L.Ed.2d 731 (1999) (emphasis

added).  Plaintiffs misconstrue this passage in that it is they, not the defendants, who

must first establish that "the legislature subordinated traditional race-neutral

districting principles." *Id.*  As was true with respect to the North Carolina's 1997

plan at issue in Hunt, the plans codified as Acts 2001-727 and 2001-729 are "not

atypical." *Id.*  It is thus plaintiffs' burden to first prove that these Acts were "drawn

with an impermissible racial motive" before this Court is required to apply the

"strict scrutiny" standard discussed in Hunt.   This, we say again, plaintiffs have

failed to do either by direct or circumstantial evidence.

   In addition to the above, plaintiffs appear to argue that a combination of

allegations, namely "when the Alabama Legislature establishes a legislative plan

that splits 'numerous counties' and 'contains population variances of up to

plus/minus five percent'," obviates their burden of proof as set forth above and

establishes a *per se* constitutional violation.  The case relied upon by the plaintiffs,

Burton v. Hobbie, 543 F. Supp 235, 241-43 (M.D. Ala. 1982)(J. JOHNSON,

concurring), does not stand for such a proposition.  In point of fact, the Court in

Burton was forced by time constraints to choose an interim plan from a number of

plans, including the plan adopted by the Alabama Legislature to which numerous

objections related to racial gerrymandering and large retrogressions in black voting strength[8] had been raised by the Department of Justice, and discussed the splitting of county lines in that comparative context alone. *See*, Burton, 543 F. Supp. at 243-48 (J. THOMPSON, dissenting).  Thus, unlike the case at bar, improper racial motivation was established to the necessary degree to obfuscate the presumption that the apportionment plan enacted by the Legislature was the result of an "honest and good faith effort to construct districts ... as nearly of equal population as is practicable." Reynolds, 377 U.S. at 577, 84 S.Ct. at 1390.  Judge Johnson did not even suggest there is a *per se* constitutional limitation on the number of counties the Legislature may split but, instead, merely concluded under the facts of that case that "the utter disregard of county boundaries obviously makes more credible plaintiffs' claims that the legislature engaged in racial gerrymandering." Burton, 543 F. Supp. at 541.

---

[8]The purpose of § 5 of the Voting Rights Act has always been to insure that no voting-procedure changes would be made that would lead to a retrogression in the position of racial minorities with respect to their effective exercise of the electoral franchise. Beer v. United States, 425 U.S. 130, 141, 96 S.Ct. 1357, 1363, 47 L.Ed.2d 629 (1976). "Retrogression"may be defined, in the context of reapportionment and redistricting, as a lessening or decrease in the voting strength of a cohesive voting bloc (such as a racial group) measured over time. See; Beer, 425 U.S. at 141, 96 S.Ct. 1363; Rybicki v. State Board of Elections of the State of Illinois, 574 F.Supp. 1082, 1108-09 and n. 74 and 75 (N.D.Ill.1982) (three-judge panel).

In contrast, the plaintiffs here have presented no evidence suggesting the application of an improper motive, racial or otherwise, by the Legislature with respect to Acts 2001-727 and 2001-729.  Since the only authority plaintiffs cite for this argument is inapposite,  the county lines split in Acts 2001-727 and 2001-729 *do not* make plaintiffs' claims of racial gerrymandering more credible and less speculative.

As a final note, plaintiffs' attempt to rely on alternative plans as evidence of improper motive is unavailing.  The possibility that a more equipopulous apportionment plan could have been drawn does not, standing alone, establish a one-person-one-vote violation.  Daly, 93 F.3d at 1221 ("The Supreme Court has expressly rejected the argument that the possibility of drafting a 'better' plan alone is sufficient to establish a violation of the one person, one vote principle."), *citing*, Gaffney v. Cummings, 412 U.S. 735, 740-41, 93 S.Ct. 2321, 2325, 37 L.Ed.2d 298 (1973).

### CONCLUSION and ORDER

For the reasons stated above, the Court concludes and it is therefore **ORDERED** that plaintiffs' motion for partial summary judgment is due to be and is hereby **DENIED**  and that defendants' motions for summary judgment are due to be and are hereby **GRANTED** with **JUDGMENT** to be entered in favor of each of the

defendants[9] and each of the defendant-intervenors[10] and against the plaintiffs[11], the

plaintiffs to have and recover nothing of the defendants.  Each party is to bear

his/her own costs.

DONE this 8th day of July, 2002.


_____          _____

Susan H. Black                         W. B. Hand
United States Circuit Judge            United States Senior District Judge



_____

Inge P. Johnson
United States District Judge


_____

[9]The defendants in this case are DON DAVIS, Probate Judge of Mobile County, Alabama;
ADRIAN JOHNS, Probate Judge of Baldwin County, Alabama; JOHN H. ARMSTRONG,
Probate Judge of Washington County, Alabama; MARY PRESNELL, Probate Judge of Clarke
County, Alabama;  OTHA LEE BIGGS, Probate Judge of Monroe County, Alabama; RACHEL
AGERTON, Probate Judge of Escambia County, Alabama; JAMES BENNETT, Alabama
Secretary of State;  STEVE WINDOM, Alabama Lieutenant Governor; ROGENE BOOKER;
CINDY D. NIELSEN;  DONALD R. COOK;  RICK ALLISON; CASSANDRA HORSLEY; W.
HARDY MCCOLLUM; LELAND AVERY; EARLEAN ISAAC; WILLIE PEARL PRICE;
MICHAEL NMI ARMISTEAD; JERRY POW; MIKE BOLIN; BILL ENGLISH; ALBERT
HOWARD; ALPHONSO MENEFEE; JOHN H. WILLIAMSON; NANCY O. ROBERTSON;
and LAMAR TURNER.

[10]The defendant-intervenors in this case are DON SIEGELMAN, Governor; KEN GUIN
and ANDREW HAYDEN.

[11]The plaintiffs in this case are GONZALO FITCH MONTIEL; SHELDON A. DAY;
JOHN LANG; CAMILLA RICE; BOBBY G. HUMPHRYES; and JOHN RICE.

904 232 2497
07/08/02   14:13   ☎904 232 2497   BLACK   →→→ HAND   ☑002/00

defendants[9] and each of the defendant-intervenors[10] and against the plaintiffs[11], the

plaintiffs to have and recover nothing of the defendants.  Each party is to bear

his/her own costs.

DONE this 8th day of July, 2002.

Susan H. Black
United States Circuit Judge

W. B. Hand
United States Senior District Judge

Inge P. Johnson
United States District Judge

---

[9] The defendants in this case are DON DAVIS, Probate Judge of Mobile County, Alabama;
ADRIAN JOHNS, Probate Judge of Baldwin County, Alabama; JOHN H. ARMSTRONG,
Probate Judge of Washington County, Alabama; MARY PRESNELL, Probate Judge of Clarke
County, Alabama;  OTHA LEE BIGGS, Probate Judge of Monroe County, Alabama; RACHEL
AGERTON, Probate Judge of Escambia County, Alabama; JAMES BENNETT, Alabama
Secretary of State;  STEVE WINDOM, Alabama Lieutenant Governor; ROGENE BOOKER;
CINDY D. NIELSEN;  DONALD R. COOK;  RICK ALLISON; CASSANDRA HORSLEY; W.
HARDY MCCOLLUM; LELAND AVERY; EARLEAN ISAAC; WILLIE PEARL PRICE;
MICHAEL NMI ARMISTEAD; JERRY POW; MIKE BOLIN; BILL ENGLISH; ALBERT
HOWARD; ALPHONSO MENEFEE; JOHN H. WILLIAMSON; NANCY O. ROBERTSON;
and LAMAR TURNER.

[10] The defendant-intervenors in this case are DON SIEGELMAN, Governor; KEN GUIN
and ANDREW HAYDEN.

[11] The plaintiffs in this case are GONZALO FITCH MONTIEL; SHELDON A. DAY;
JOHN LANG; CAMILLA RICE; BOBBY G. HUMPHRYES; and JOHN RICE.

defendants[9] and each of the defendant-intervenors[10] and against the plaintiffs[11], the

plaintiffs to have and recover nothing of the defendants.  Each party is to bear

his/her own costs.

DONE this 8th day of July, 2002.


_____                    _____
Susan H. Black                                 W. B. Hand
United States Circuit Judge                     United States Senior District Judge


_____
Inge P. Johnson
United States District Judge


_____

[9]The defendants in this case are DON DAVIS, Probate Judge of Mobile County, Alabama; ADRIAN JOHNS, Probate Judge of Baldwin County, Alabama; JOHN H. ARMSTRONG, Probate Judge of Washington County, Alabama; MARY PRESNELL, Probate Judge of Clarke County, Alabama;  OTHA LEE BIGGS, Probate Judge of Monroe County, Alabama; RACHEL AGERTON, Probate Judge of Escambia County, Alabama; JAMES BENNETT, Alabama Secretary of State;  STEVE WINDOM, Alabama Lieutenant Governor; ROGENE BOOKER; CINDY D. NIELSEN;  DONALD R. COOK;  RICK ALLISON; CASSANDRA HORSLEY; W. HARDY MCCOLLUM; LELAND AVERY; EARLEAN ISAAC; WILLIE PEARL PRICE; MICHAEL NMI ARMISTEAD; JERRY POW; MIKE BOLIN; BILL ENGLISH; ALBERT HOWARD; ALPHONSO MENEFEE; JOHN H. WILLIAMSON; NANCY O. ROBERTSON; and LAMAR TURNER.

[10]The defendant-intervenors in this case are DON SIEGELMAN, Governor; KEN GUIN and ANDREW HAYDEN.

[11]The plaintiffs in this case are GONZALO FITCH MONTIEL; SHELDON A. DAY; JOHN LANG; CAMILLA RICE; BOBBY G. HUMPHRYES; and JOHN RICE.

19

IN THE UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | | |
|---|---|---|
| GONZALO FITCH MONTIEL, et al., | ) | |
| | ) | **PUBLISH** |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | CIVIL ACTION NO. |
| | ) | 01-447-BH-S |
| DON DAVIS, et al, | ) | |
| | ) | |
| Defendants. | ) | |

## CONCURRENCE

I concur in the majority decision granting summary judgment in favor of the defendants. I write separately only to emphasize a few points.

This action initially was brought by plaintiff Gonzalo Fitch Montiel[1] based on the failure of the legislature of the State of Alabama to redistrict its own House of Representatives and Senate seats despite publication of the 2000 federal census. Due to population shifts within the state, the legislative districts had become malapportioned. Consequently, Montiel asserted any further elections under the then-current districting plans would violate the "one man, one vote" guarantee of the Fourteenth Amendment's Equal Protection Clause.

---

[1] Additional plaintiffs were added by the Third Amended Complaint, filed in December 2001.

904 232 2497
07/08/02   10:22   ☎904 232 2497          BLACK          →→→ HAND          🖼003/00

Four days after Montiel filed his complaint, the Alabama Legislature was called into special session by Governor Don Siegelman.  In the special session, the Legislature enacted Act 2001-727, a new districting plan for the Alabama State Senate, and Act 2001-729, a new districting plan for the Alabama State House of Representatives.  Both Acts were signed into law by Governor Siegelman on July 3, 2001, and submitted to the United States Department of Justice for preclearance as required by § 5 of the Voting Rights Act of 1965.  Act 2001-727 was precleared on October 15, 2001; Act 2001-729 was precleared on November 5, 2001.

Having indirectly attained his goal of obtaining new districting plans based on the 2000 census data, Montiel promptly amended his complaint to challenge those new plans.  The crux of Montiel's subsequent challenge, currently before this Court, is his belief the new districting plans were drawn along racial lines so as to maximize the strength of votes within black majority districts.  In other words, Montiel contends the Alabama Legislature used race as a basis for separating voters into districts.  When a legislature draws districts based on race, such an act constitutes racial gerrymandering.[2]

---

[2]In his first amended complaint, Montiel alleged the new districting plans violated § 2 of the Voting Rights Act, rather than arguing they were racially gerrymandered in violation of the Equal Protection Clause of the Fourteenth Amendment.  His assertion blurs the distinction between the two types of claims.  Section 2 of the Voting Rights Act prohibits a state from enacting a particular voting scheme as a purposeful device to minimize or cancel out the voting potential of racial or ethnic minorities.  *See generally Thornburg v. Gingles*, 478 U.S. 30, 106 S.

Perhaps based on concerns regarding standing, Montiel did not directly assert a racial gerrymandering claim. *See generally United States v. Hays*, 515 U.S. 737, 744, 115 S. Ct. 2431, 2436 (1995) (holding citizens who did not live in majority-minority district that was the primary focus of racial gerrymandering claim lacked standing to bring suit); *Sinkfield v. Kelley*, 531 U.S. 28, 29-30, 121 S. Ct. 446, 446-47 (2000) (holding white voters who challenged their own majority-white state legislative districts under redistricting plan whose purpose was creation of majority-minority districts, some of which bordered voters' districts, lacked standing to claim redistricting plan was racial gerrymandering).[3] Rather, Montiel attempts to bootstrap a racial gerrymandering claim through his amended "one man, one vote" challenge.

"[T]he Equal Protection Clause guarantees the opportunity for equal participation by all voters in the election of state legislators." *Reynolds v. Sims*, 377 U.S. 533, 566, 84 S. Ct. 1362, 1384 (1964). Relatively minor population

---

Ct. 2752 (1986) (discussing the elements of a § 2 claim). Section 2 claims often are referred to as vote dilution claims. By contrast, the essence of a racial gerrymandering claim is that the state has segregated citizens into voting districts on the basis of race. *See generally Shaw v. Reno*, 509 U.S. 630, 113 S. Ct. 2816 (1993) (discussing racial gerrymandering by segregating races for purposes of voting). In his amended complaint, Montiel did not allege the votes of black citizens were diluted as a result of the new districting plans; rather, Montiel asserted the votes of those citizens were increased though racially selective assignment into voting districts.

[3]Interestingly, Montiel was a named plaintiff in the *Sinkfield* case, an action challenging the State of Alabama's prior legislative districts as racially gerrymandered. He was represented in that case by the same attorney representing him in the instant action.

3

07/08/02   10:23   ☎904 232 2497       , BLACK       →→→ HAND       ☒005/0(

deviations among state legislative districts, however, are not considered to "substantially dilute the weight of individual votes in the larger districts so as to deprive individuals in these districts of fair and effective representation." *White v. Regester*, 412 U.S. 755, 763, 93 S. Ct. 2332, 2338 (1973). Deviations of under 10% are viewed as *de minimis* and are presumed to be constitutional. *See id.* If an apportionment plan has a *de minimis* maximum deviation in total population, the plan will not violate the "one person, one vote" principle, absent evidence the plan was the product of "arbitrariness or discrimination." *Daly v. Hunt*, 93 F.3d 1212, 1220 (4th Cir. 1996) (quoting *Roman v. Sincock*, 377 U.S. 695, 710, 84 S. Ct. 1449, 1458 (1964)).

Raising a novel "one man, one vote" argument, Montiel asserts the *de minimis* deviations contained in Alabama's new redistricting plans are the product of discrimination because they resulted from efforts to underpopulate black majority districts so as to maximize the relative voting strength of black voters. In effect, Montiel argues the "one man, one vote" guarantee of the Equal Protection Clause has been violated because the legislative districts were racially gerrymandered.[4]

---

[4]By couching his claim as a "one man, one vote" challenge, Montiel effectively evaded potential problems regarding his standing to bring a racial gerrymandering claim.

4

07/08/02   10:24   ☎904 232 2497              BLACK          →→→ HAND          ☑006/0

904 232 2497

Even assuming Montiel's theory raises a legitimate "one man, one vote"

claim, he nevertheless cannot establish his *prima facie* case.   A plaintiff

challenging a facially neutral law based on racial gerrymandering must show the

law is unexplainable on any grounds other than race. *Hunt v. Cromartie*, 532 U.S.

241-42, 121 S. Ct. 1452, 1458 (2001).  Race must not merely have been a factor,

but must have been the predominant factor motivating the legislature's districting

decisions. *Id.* As discussed in detail by the majority, Montiel has failed to present

sufficient evidence to support his claim.


Susan H. Black
United States Circuit Judge

5